UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JAVIER DEL RIO, *et al.*, | ) | CASE NO. 3:21-cv-1152 (KAD) |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMAZON.COM SERVICES, INC., *et al.*, | ) | SEPTEMBER 20, 2023 |
| *Defendants*. | ) | |

**MEMORANDUM OF DECISION**
**RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 114)**

Kari A. Dooley, United States District Judge:

Plaintiffs Javier Del Rio, Colin Meunier, and Aaron Delaroche, current and former warehouse workers employed at Amazon fulfillment centers located in Connecticut, have brought a putative class action on behalf of themselves and similarly situated warehouse workers against Defendants Amazon.com Services, LLC, Amazon.com.dedc, LLC, and Amazon.com, Inc. ("Defendants" or "Amazon"). Plaintiffs assert in the operative Amended Complaint two causes of action against Defendants: (1) a failure to pay straight time wages in violation of Conn. Gen. Stat. §§ 31-72; 31-71b *et seq.* and Conn. Agencies Regs. § 31-60-11; and (2) a failure to pay overtime wages in violation of Conn. Gen. Stat. §§ 31-68; 31-76b(2)(A) *et seq.*[1] Plaintiffs allege that Defendants violated Connecticut wage laws by requiring employees to go through a mandatory security screening process prior to leaving the facility without compensating them for time spent doing so. Defendants move for summary judgment on the ground that such time is not compensable as articulated in *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27 (2014). For the following reasons, the motion for summary judgment is GRANTED. (ECF No. 114)

**Standard of Review**

---
[1] Plaintiff Del Rio does not bring a claim for overtime in Count Two.

The standard under which courts review motions for summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," while a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Significantly, the inquiry being conducted by the court when reviewing a motion for summary judgment focuses on "whether there is the need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250. As a result, the moving party satisfies his burden under Rule 56 "by showing . . . that there is an absence of evidence to support the nonmoving party's case" at trial. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks omitted). Once the movant meets his burden, the nonmoving party "must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "[T]he party opposing summary judgment may not merely rest on the allegations or denials of his pleading" to establish the existence of a disputed fact. *Wright*, 554 F.3d at 266; *accord Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted; internal quotation marks omitted). Nor will wholly implausible claims or bald assertions that are unsupported by evidence. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986). "[T]here is no issue for trial unless

there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). "In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002).

**Facts**

The following facts are taken from Defendants' Local Rule 56(a)(1) Statement of Material Facts ("Def. LRS," ECF No. 118), Plaintiffs' response thereto ("Pl. LRS," ECF No. 120), and the parties' exhibits. The facts are largely undisputed.

Amazon[2] owns and operates several fulfillment centers in and around Connecticut. Def. LRS at 2 ¶ 4. These fulfillment centers are warehouses that store items that are later sent out to fulfill individual customer orders. Def. LRS at 2 ¶ 5. Plaintiffs worked as Fulfillment Associates (Package Handlers) at Amazon warehouses in Windsor and North Haven, Connecticut. Def. LRS at 2 ¶ 4, 3 ¶¶ 7–9. During the relevant period, from April 2018 to March 15, 2020, Amazon required employees of the Windsor and North Haven fulfillment centers to go through a mandatory security screening process to enter and leave the warehouse. Def. LRS at 3 ¶ 10.

---

[2] Amazon.com.dedc, LLC merged into Amazon.com Services, Inc., and is now known as Amazon.com Services, LLC. Def. LRS at 2 ¶ 1. Amazon.com, Inc. is an indirect parent corporation of Amazon.com Services, LLC and did not employ Plaintiffs. Def. LRS at 2 ¶¶ 2–3.

The security screening procedure is as follows. Employees swiped their security badge to unlock a turnstile and entered the warehouse through its sole entrance. Def. LRS at 3 ¶ 10. Upon entering, employees could store their personal items in a locker room and food in a breakroom located next to the locker room. Def. LRS at 3– 4 ¶ 12. Thereafter, employees would enter a security area wherein they would clock into their shift by swiping their security badge at a timeclock. Def. LRS at 4 ¶ 15. Employees would pass under a metal detector to enter or leave the secured area of the warehouse. Def. LRS at 4 ¶ 16. There were three available security screening processes available: Express Lanes, Divesting Tables, and X-Ray Machines. Def. LRS at 4 ¶ 17. Employees could choose among the processes depending on what items they wished to bring into the secured area of the warehouse. Def. LRS at 5 ¶¶ 22 Employees who chose to bring items such as bags and lunch boxes were required to put their items through an X-Ray Machine while they walked under the metal detector. Def. LRS at 5 ¶ 20. Employees who chose to bring "pocket" items such as keys, wallets, and cigarettes could put those items in a basket at the Divesting Table while they walked under the metal detector. Def. LRS at 4–5 ¶ 19. Employees without any items could use the Express Lane, in which they could walk under the metal detector without breaking stride. Def. LRS at 4 ¶ 18. If an employee set off an alarm during the security screening process, they were required to go to Secondary Screening, during which they removed all items from their possession and were "wanded" by a security guard. Def. LRS at 5 ¶ 21.

The Express Lane allowed an employee to pass through security without adding additional time to the process. Def. LRS at 5–6 ¶ 24. Delaroche chose to bring his keys through security because it was quicker and more convenient than storing them in the locker room. Def. LRS at 6 ¶ 27. Meunier also frequently brought his keys with him through security. Def LRS at 6 ¶ 28. Even the slowest screening process, the X-Ray Machine, took an average of ten seconds. Def. LRS at 7

¶ 30. Employees typically passed through the security screening process in three minutes or less, and those who used the Express Lane could do so in seconds. Def. LRS at 7 ¶ 31. The longest time Meunier ever spent going through the security screening process, including Secondary Screening, was ten minutes. Def. LRS at 7 ¶ 32. His maximum time in a typical security screening process, excluding the Secondary Screening, was three to four minutes. *Id.* The longest time Delaroche ever spent going through the security screening process, including Secondary Screening, was twenty minutes, although he acknowledged that was not a typical amount of time and most of the time, the process was quick. Def. LRS at 8 ¶ 34. Even employees who went through Secondary Screening could pass through in less than a minute. Def. LRS at 7 ¶ 33.

The fulfillment centers also had breakrooms in the secured area, which would allow employees to take their break or eat in the warehouse without needing to pass through the security screening process to eat in the breakroom located outside the secured area, outside the building, or off premises. Def. LRS at 8 ¶ 36. The internal breakrooms contained vending machines and refrigerators for employees to store their food. Def. LRS at 8 ¶ 36. Timeclocks were also located nearby the internal breakrooms so that employees could clock in or out for their break. Def. LRS at 8 ¶¶ 35–36.

**Discussion**

Defendants now seek summary judgment because the Supreme Court in *Integrity Staffing* held that time spent in security lines is not compensable under the federal Fair Labor Standards Act ("FLSA"), as amended by the Portal-to-Portal Act ("PTPA"), and because Connecticut wage laws were drafted to mirror the FLSA and the PTPA, the same result must be reached here. Alternatively, Defendants contend that even if time spent in security lines is compensable, the record evidence demonstrates that the time spent in this case was *de minimis*. Plaintiffs dispute the

applicability of *Integrity Staffing* to their claims and challenge whether Connecticut law has codified or otherwise adopted the PTPA. The Court agrees with Defendants that the time spent in security lines is not compensable under Connecticut wage laws and therefore does not reach the latter argument.

Congress enacted the FLSA in 1938 and thus established the federal minimum wage and overtime compensation requirements for each workweek. Pub. L. 75-718, 52 Stat. 1060 (1938); 29 U.S.C. §§ 201 *et seq*. Notably, the FLSA did not define "work," or "workweek," leaving the Supreme Court to fill in the statutory gaps. In *Tennessee Coal, Iron & R. Co v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944), the Supreme Court defined "work" as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." This became known as the "predominant benefit test." *See e.g.*, *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 64–65 (2d Cir. 1997). Similarly, the Supreme Court defined "workweek" to "include all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 690–91 (1946) (cleaned up). In separate cases, the Supreme Court held that time spent traveling between mine portals and underground work areas as well as time walking from timeclocks to work benches were compensable. *Id.* at 598; *Mt. Clemens*, 328 U.S. at 691–92.

An onslaught of litigation ensued by employees seeking backpay and damages for both preliminary and postliminary activities in the workplace. *Integrity Staffing*, 574 U.S. at 31–32. This prompted Congress to pass the PTPA in 1947. *Id.* at 32. The PTPA exempts employers from liability for the failure to pay an employee overtime for time spent "(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such

6

employee is employed to perform" and "(2) activities which are preliminary to or postliminary to said principal activity or activities." 29 U.S.C. 254(a).

In *Integrity Staffing,* the Supreme Court assessed whether "activities which are preliminary to or postliminary to said principal activity or activities" applied to Amazon warehouse workers who were required to go through antitheft security screenings before leaving the warehouse and held that such time was not compensable under the FLSA as amended by the PTPA. *Integrity Staffing*, 574 U.S. at 29, 35. The Supreme Court determined that the screenings were not the "principal activity" the employees were employed to perform; rather, they were employed "to retrieve products from warehouse shelves and package those products for shipment to Amazon customers." *Id.* at 35. Moreover, the security screenings were not "integral and indispensable" to the employees' duties because the screenings were not "an intrinsic element of retrieving products from warehouse shelves or packing them for shipment." *Id.* Indeed, the employer could have done away with the screenings completely "without impairing the employees' ability to complete their work." *Id.*[3] Finally, the Supreme Court rejected the predominant benefit test as an "overbroad" metric for defining "work." *Id.*

Accordingly, the question for this Court is whether Connecticut law compels the same conclusion as the Supreme Court reached in *Integrity Staffing* under federal law.

Connecticut enacted its overtime statutes in 1967, 29 years after the FLSA and 20 years after the PTPA. *See* Conn. Pub. Act No. 493 (1967); Conn. Gen. Stat. § 31–76b *et seq*. Connecticut

---

[3] The Supreme Court distinguished precedent that held certain preliminary or postliminary conduct to be compensable time. For example, time spent by employees who worked at a battery plant showering and changing clothes after work was compensable because the chemicals they were exposed to were toxic, and thus, "the clothes-changing and showering activities of the employees were indispensable to the performance of their productive work and integrally related thereto." *Id.* at 34 (citing *Steiner v. Mitchell*, 350 U.S. 247, 249 (1956)). But, in contrast, the Supreme Court explained that it had held as not compensable time that poultry-plant employees spent waiting to don protective gear because that was "two steps removed from the productive activity on the assembly line." *Id.* (citing *IBP, Inc. v. Alvarez*, 546 U.S. 21, 42 (2005)).

requires employers to pay employees "wages" for "hours worked." *Sarrazin v. Coastal, Inc.*, 311 Conn. 581, 623 (2014) (McDonald, J., concurring); Conn Gen. Stat. § 31-71a(3) (defining wages). The statute defines "hours worked" as:

> [A]ll time during which an employee is required by the employer to be on the employer's premises or to be on duty, or to be at the prescribed work place, and all time during which an employee is employed or permitted to work, whether or not required to do so, provided time allowed for meals shall be excluded unless the employee is required or permitted to work. Such time includes, but shall not be limited to, the time when an employee is required to wait on the premises while no work is provided by the employer.

Conn. Gen. Stat. § 31-76b(2)(A). However, similar to the FLSA, the statute is silent about what constitutes "work," a definition of which is "reasonably necessary to effectuate the statutory definition of 'hours worked.'" *See Belgada v. Hy's Livery Serv., Inc.*, 220 Conn. App. 102, 120 (2023). Where state law is "uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the state . . . would resolve the uncertainty or ambiguity." *First Invs. Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 165 (2d Cir. 1998). The Court therefore looks to Connecticut state court decisions for guidance to determine what is "work" for the purposes of Connecticut's wage law.

The Appellate Court in *Belgada*, upon concluding that "work" as used in § 31-76b(2)(A) is ambiguous, turned to extratextual sources to discern the meaning of the word and found that the legislative history makes clear "that the purpose of the [overtime wage] act was to make Connecticut law coextensive with federal overtime law." *Belgada*, 220 Conn. App. at 120; *see also Williams v. General Nutrition Centers, Inc.*, 326 Conn. 651, 659 (2017) ("[General Statutes §] 31-76c, which sets forth the overtime requirement, is nearly identical to the federal overtime statute," 29 U.S.C. § 207(a)(1)). And because Connecticut's overtime scheme is analogous to the FLSA, Connecticut "appellate courts customarily" look to federal statutes and precedent when interpreting equivalent provisions, including how to interpret the word "work" in § 31-76b(2)(A).

8

*Belgada*, 220 Conn. App. 121, 123–24 (holding "pursuant to § 31-76(b)(2)(A), a meal break is not an 'hour worked' unless the 'employee is required or permitted to work' during that break, and the test for what constitutes 'work' is the predominant benefit test" as defined by the United States Supreme Court); *Roto-Rooter Servs. Co. v. Dept. of Labor*, 219 Conn. 520, 528 n.8 (1991) (considering federal precedent on meaning and scope of FLSA exemption to interpret equivalent state law exemption); *Williams*, 326 Conn. at 569 (seeing "no reasoning to interpret [the relevant Connecticut wage statute] differently from its federal counterpart"). This Court therefore concludes, consistent with longstanding precedent from the Connecticut Supreme and Appellate Courts, that it is appropriate to turn to federal precedent, to include *Integrity Staffing*, when deciding whether the time Plaintiffs spent in security screenings is compensable under Connecticut wage laws.[4]

Plaintiffs do not disagree that this Court may look to federal precedent to interpret the term "hours worked" as used in Connecticut's statute but argue that the relevant precedent is the

---

[4] The Court recognizes that the Connecticut Appellate Court concluded that the appropriate test under Connecticut law for what constitutes "work" under § 31-76b(2)(A) is the federal "predominant benefit test." *Belgada*, 220 Conn. App. at 124–25. And ordinarily, a federal district court is guided by state appellate courts on issues involving state law. *Dibella v. Hopkins*, 403 F.3d 102, 112 (2d Cir. 2005) ("Principally, we consider the language of the state intermediate appellate courts to be helpful indicators of how the state's highest court would rule. . . . Although we are not strictly bound by state intermediate appellate courts, rulings from such courts are a basis for 'ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'"). However, under the unique circumstances here, the Court does not follow *Belgada*'s conclusion that the federal "predominant benefit test" is the appropriate standard. In concluding that whether activity is "work" is determined by looking to the federal "predominant benefit test," the Appellate Court relied upon federal cases that pre-dated the Supreme Court's decision in *Integrity Staffing*. Those cases had held that "work" means "physical or mental exertion (whether burdensome or not) controlled or required by the employer and *pursued necessarily and primarily for the benefit of the employer and his business*." *See, e.g.*, *Reich*, 121 F.3d at 64 (citing *Tennessee Coal*, 321 U.S. at 598)) (emphasis added). However, this "predominant benefit test" was rejected by the Supreme Court as "overbroad" because the PTPA was designed specifically to exclude certain required activities, such as walking to a timeclock. *Integrity Staffing*, 574 U.S. at 36. The *Belgada* court neither discussed nor cited *Integrity Staffing* in its decision. A review of the state docket also reveals that the parties in *Belgada* likewise did not cite or discuss *Integrity Staffing* in their briefing at the Appellate Court or to the trial court. The Court therefore concludes that in light of the Appellate Court's stated intention of following federal precedent, *see Belgada*, 220 Conn. App. at 121, the Connecticut Supreme Court's well-established practice of looking to federal precedent to interpret Connecticut's wage laws, and the legislature's intent to bring Connecticut's wage laws into alignment with federal overtime law, that had the Appellate Court considered *Integrity Staffing*'s holding regarding that which constitutes "work," it would have followed *Integrity Staffing*.

9

Supreme Court's decision in *Mt. Clemens* because § 31-76b(2)(A) tracks that decision's language. *Compare Mt. Clemens*, 328 U.S. at 690–91 (compensable time includes "all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace"); *with* Conn. Gen. Stat. § 31-76b(2)(A) ("Hours worked" includes "all time during which an employee is required to be on the employer's premises or to be on duty, or to be at the prescribed workplace"). Plaintiffs also argue that the Connecticut legislature did not expressly incorporate the PTPA, rendering *Integrity Staffing* inapplicable, and that this Court should follow the reasoning of decisions out of the Sixth Circuit Court of Appeals, the District of New Jersey, and Pennsylvania that held that time spent undergoing security screenings were compensable under their respective state wage laws. The Court addresses each argument in turn.

First, the relevant definition at issue is not "hours worked" but, rather, "work." While the language of § 31-76b(2)(A) certainly tracks the language in *Mt. Clemens*, the purpose of "hours worked" cannot be effectuated without first defining what constitutes "work." *See Belgada*, 220 Conn. App. at 120. The Supreme Court explained that preliminary or postliminary work is not compensable "work" under the FLSA unless it is "integral and indispensable to the principal activities that an employee is employed to perform," and such activity is integral and indispensable if it is "one with which the employee cannot dispense if he is to perform his principal activities." *Integrity Staffing*, 574 U.S. at 33. *See also Sarrazin*, 311 Conn. at 598 ("To determine whether travel time constitutes compensable 'work' under the Portal-to-Portal Act, courts consider whether the employee's commuting time is integral and indispensable to the principal work activity."). Indeed, the Supreme Court explained that the PTPA "evinces Congress' intent to repudiate" *Mt. Clemens*'s holding. *Integrity Staffing*, 574 U.S. at 36–37 (citing *IBP, Inc. v. Alvarez*, 546 U.S. 21, 41 (2005)).

Second, while it is true that the Connecticut legislature did not expressly incorporate the PTPA into Connecticut's wage law, and while silence on the issue *can* indicate an intent on the part of the legislature to exclude or otherwise decline to incorporate federal law, here, the Connecticut Supreme Court has directed that when Connecticut wage laws are silent on a particular issue, courts should consider federal statutes and precedent on that issue. *See Williams*, 326 Conn. at 659. Further, Connecticut enacted its wage laws long after Congress had enacted both the FLSA and the PTPA, and the legislature did so to bring Connecticut's laws into alignment with federal overtime laws. *Belgada*, 220 Conn. App. at 124. Thus, insofar as the PTPA was a federal overtime law when the Connecticut legislature enacted Connecticut's wage laws, the Court concludes that the Connecticut legislature intended to incorporate both the FLSA and the PTPA when enacting its overtime scheme. And there is simply no extratextual indication that the legislature intended to exclude the PTPA. "[W]hen the overlap between state and federal law is deliberate, as in this case, federal decisions are particularly persuasive." *Comm'n on Human Rights & Opportunities v. Savin Rock Condo. Ass'n, Inc.*, 273 Conn. 373, 386 (2005).

The Court also finds persuasive the reasoning of several other courts that have reached the same conclusion under circumstances similar to those present here. *See, e.g.*, *Buero v. Amazon.com Servs., Inc.*, 370 Or. 502, 526–27 (2022) (holding that "Oregon statutes and administrative rules regarding what activities are compensable were intended to mirror federal law" as evidenced by the structure and text of such statutes and rules as well as the legislative and administrative history regarding their enactment and promulgation); *Buero v. Amazon.com Servs.*, Inc., 61 F.4th 1031, 1033 (9th Cir. 2023) ("Because the Oregon Supreme Court has squarely held that Oregon law aligns with federal law regarding what activities are compensable, . . . and because Plaintiff fails to allege that undergoing a mandatory security screening is 'an integral an indispensable part' of

11

an employee's principal activities, . . . her claims fails.") (citations omitted); *Hughes v. UPS Supply Chain Solutions, Inc.*, 2023 WL 5444612, at*3–*5 (Ky. Aug. 24, 2023) (Kentucky statute "ambiguous in that it does not define 'work,' and contains no provision which addresses, either way, whether preliminary or postliminary activities constitute compensable work or time on the job," but finding a connection between text of the PTPA and administrative regulations, and legislative inaction that "demonstrates that the legislature has ratified, or at the very least acquiesced" to interpreting such regulations to exclude security screenings as noncompensable activities, and citing to *Integrity Staffing* for such proposition). As discussed above, the Connecticut Supreme and Appellate Courts have consistently held that Connecticut's overtime laws are coextensive with federal overtime laws, thus supporting a legislative intent to incorporate the PTPA and the ability of this Court to consider the Supreme Court's decision in *Integrity Staffing* as persuasive authority.[5]

The Court concludes therefore that the time Plaintiffs spent in security lines is not "work" compensable under Connecticut's wage laws because it is not "indispensable to the performance of their productive work and integrally related thereto" their duties "of retrieving products from

---

[5] The Court is not persuaded by and readily distinguishes cases cited by Plaintiff as either arising where the state courts have declined to follow federal interpretations of the FLSA or had specified which aspects of federal law were included in state legislation (and by extension, excluding others). *See e.g.*, *In re Amazon.com, Inc.*, 255 A.3d 191, 200–02 (Pa. 2021) (declining to engraft the PTPA onto Pennsylvania's wage laws in light of legislative silence and prior decisions declining to follow federal interpretations "of similarly applicable provisions of the federal FLSA"); *Roberts v. State*, 253 Ariz. 259, 267 (2022) (holding that state law did not incorporate federal law when there was only "a single reference [to a FLSA provision] for a specific, limited purpose"); *Amaya v. DGS Construction, LLC*, 479 Md. 515, 525, 556–57, 559 (2022) (holding that the PTPA "has not been adopted or incorporated into Maryland law" because Maryland's wage law does not refer to the PTPA, does not use phrases in the PTPA such as "principal activity," "preliminary," or "postliminary to," and only refers to the FLSA as "the federal Fair Labor Standards Act of 1938" and not as amended by the PTPA). The Court also recognizes that the Sixth Circuit Court of Appeals has also held that the time that Amazon warehouse workers spent in security lines was compensable under Nevada law because "the Nevada legislature has chosen not to affirmatively adopt the [PTPA] anywhere in the Nevada state code," and reached a similar conclusion under Arizona law. *Busk v. Integrity Staffing Sols., Inc.*, 905 F.3d 387, 402–05 (6th Cir. 2018); *Vaccaro v. Amazon.com.dedc, LLC*, 2020 WL 3496973, at *6 (D.N.J. June 29, 2020) (same analysis but interpreting New Jersey law).

warehouse shelves or packing them for shipment." *Integrity Staffing*, 574 U.S. at 34–35 (quoting *Steiner*, 350 US. at 249). Defendants are therefore entitled to judgment as a matter of law.

**Conclusion**

Defendants' Motion for Summary Judgment is GRANTED. (ECF No. 114) The Clerk of the Court is directed to enter judgment in favor of Defendants and to close this matter.

**SO ORDERED** at Bridgeport, Connecticut, this 20th day of September 2023.

       */s/ Kari A. Dooley*
       KARI A. DOOLEY
       UNITED STATES DISTRICT JUDGE